603 A.2d 1301

**The TRAVEL COMMITTEE, INC., et al.,**

v.

**PAN AMERICAN WORLD AIRWAYS, INC.**

No. 848 Sept. Term, 1991.

Court of Special Appeals of Maryland.

April 7, 1992.

---

**128**

Shale D. Stiller (Evelyn W. Pasquire, William L. Reynolds, Robert A. Weber and Frank, Bernstein, Conaway & Goldman, on the brief) Baltimore, for appellants.

Thomas C. Valkenet and John P. Sarbanes (George F. Pappas and Venable, Baetjer and Howard, on the brief) Baltimore (Lawrence N. Chanen, New York City, of counsel), for appellee.

Argued before MOYLAN, ALPERT and DAVIS, JJ.

ALPERT, Judge.

From Daedalus and Icarus, to Orville and Wilbur Wright, mortals have dared to dream of flying. It is the realization of that dream that brought us the airline travel industry. A conflict between participants in that industry brings us this appeal.

We face the task of untangling this case's factual context and procedural background with no small amount of trepidation, and caution the reader that we have pursued clarity at the expense of brevity.

The dispute evolved from a series of business transactions between one of the best known airlines, here and abroad, and a large-volume travel agency. Eventually, the parties took their differences to court, litigating a fifteen-count complaint, and a fourteen-count counterclaim. Judgment eventually was entered against the travel agency, which now appeals. Additionally, the appellees noted a cross appeal.

## PROCEDURAL HISTORY

Pan American World Airways, Inc. (Pan Am) filed a fifteen-count Fifth Amended Complaint against Travel Committee, Inc. (TCI), Travel Destinations Unlimited, Inc. (TDU), Travel Destinations, Inc. (TDI), and their principals, Ira Weiner and Stanley Levin.[1] TCI and TDU filed a fourteen-count Amended Counterclaim.

A three week trial was held in the Circuit Court for Baltimore County, Murphy, J., presiding, and on August 20, 1990, and August 24, 1990, the court entered certain judgments on the plaintiff's Fifth Amended Complaint and on the defendant's Counterclaim. On October, 11, 1990, the court ruled upon certain motions, and entered judgments in the amounts of $404,726.77 against TCI, and $1,570,083.26 against TDU, TCI, Weiner, and Levin. No judgment was entered on several of the claims and counterclaims, and, by virtue of a clerical error, no judgment was entered for or against TDI. On October 1, 1991, this court ordered the trial court to enter an Order, which it did on October 7, 1991, directing the clerk of the Circuit Court to enter a judgment of $1,974,810.03, the sum total of the monetary judgments, against TDI on count fourteen of Pan Am's Fifth Amended Complaint. The defendants appealed on

---

1. We shall refer collectively to these as "the defendants" when we refer to proceedings in the lower court, and as "TCI" when we have occasion to refer to the present proceedings. At times, we also must refer to them individually. Weiner and Levin own TDU and TDI; TDU owns TCI.

November 9, 1990; Pan Am filed a cross appeal on November 16, 1990.

## FACTS

### a. Travel Industry Background Information

Retail agencies sell airline seats to the public at published airline prices, then pay the airline those prices minus a commission. Wholesalers, who market air tours that include rooms and land travel, and consolidators, who deal only in high-volume air travel, sell bulk blocks of tickets to retail agencies. Wholesalers and consolidators buy "net tickets" in bulk from the airlines at reduced prices, and sell them through retail agencies that book reservations for their customers. The wholesaler/consolidator and the airline enter "net ticketing agreements" that set net prices and restrictions for tickets bought in bulk.

The Airlines Reporting Commission (ARC), an organization owned by 130 airlines, accredits travel agencies and furnishes them standard ticket stock to use in writing tickets for any of the airlines in the ARC system. An airline that appoints an ARC-accredited travel agency to act as its agent gives the agency an "ARC plate," [2] to use in validating tickets the agency writes. These tickets are valid for any airline in the ARC system.

An ARC agency must file with ARC a weekly report of tickets it wrote during the previous week. Ten days after the end of each reporting period, ARC gives the airlines a draft on the agency's bank account for the net remittance, minus the agency's commission: this means that member agencies make only one payment for tickets sold. Agencies must make full payment of all amounts owed to airlines. Agents hold ticket sale proceeds, minus the agent's commission, in trust for the carrier. ARC does not require agencies to segregate into separate accounts the money an agency collects from passengers, and ARC does not segre-

---

**2.** The ARC plate is much like a credit card in size.

gate the funds it collects that are destined for the individual airlines.

If an agent defaults on its payments to ARC, ARC or the airlines may repossess the agent's ARC plates for writing tickets. Alternatively, an airline may agree to a "direct form of payment" for a particular weekly report, in which case, the agent and the airline settle collection issues between themselves, and the agent pays the airline directly for tickets written through ARC.

The airlines and the agents each audit ARC's reports. If an airline has been underpaid, the airline issues a debit memo showing the additional amount due. An agency that makes an overpayment submits a sales summary adjustment showing the refund the carrier owes the agency. If an agent writes a new ticket to replace a lost ticket, the agent submits to the airline a "lost ticket advice" to obtain reimbursement for the duplicate payment.

According to the appellants, wholesalers routinely "batch" reservations by booking the reservations into the airline's reservation system and collecting the fares in advance of a tour, but they write and deliver the tickets to passengers just two or three weeks before the tour departs. This practice exposes the passengers or the agency to the risk that in the interim, the airline will raise its rates. According to Pan Am, "in the airline industry, the ticketing is what guarantees the fare."

### b. The Case

Stanley Levin and Ira Weiner, the appellants/counter-appellees, began a travel business in 1968, and in 1970 incorporated Travel Destinations Unlimited, Inc. (TDU),[3] a retail travel agency, and Travel Committee, Inc. (TCI), a wholesaler/consolidator travel agency. TCI is a wholly owned subsidiary of TDU. TDU was ARC-accredited, and had ARC plates for every major airline. ARC viewed TCI

---

3. The agency was renamed World Travel, Inc.

as a "branch office" of TDU, and permitted it to use TDU's plates.

TCI began selling Pan Am charter flights in 1975 or 1976, but as the charter business dissipated in the mid-1980s, airlines began to offer surplus seats on regularly scheduled flights at prices the airlines classified as "B class" fares. TCI began selling "B class" seats; Pan Am was TCI's major carrier.

After June, 1986, TCI's consolidator business improved, and during the summer and fall of 1986, Pan Am urged TCI to sell as many of the new "B class" fares as it could.

In December 1986 or January 1987, Pan Am gave TCI its 1987 summer schedule of net ticket prices for "B class" fares. TCI used this information to produce its summer brochure, and began marketing "B class" seats for the summer, and taking reservations at the prices Pan Am set in the summer schedule. TCI alleges that it did this with Pan Am's blessing, and that Pan Am urged TCI to sell as many "B class" seats as possible. We note, however, testimony acknowledging that Pan Am indicated to TCI that it was "thinking about, but ... hadn't at that time, put in some form of different class air service...."

In March, 1987, Pan Am informed TCI that it had created a new "H-class," and that it would give TCI blocks of these seats on its 1987 flights. Pan Am also told TCI that reservations at the fares contained in its summer schedule were to be booked in the new blocks of "H-class" seats, instead of in "B class" seats, including the reservations TCI already had booked. This change limited the number of seats TCI could sell at its net ticket prices, forcing TCI to cancel previously booked reservations and re-book them in "H-class" seats in order to honor the fares quoted to passengers with "B class" reservations. Fewer "H-class" seats were available than the number of reservations TCI had already sold, and no "H-class" seats were available to certain destinations.

Weiner complained to John (Jerry) Murphy, Pan Am's Vice President and General Sales Manager. Murphy told Weiner that TCI could continue to book passengers in "B class" seats, but that these seats would cost $120 more than originally quoted and charged to passengers who already had reserved seats. TCI paid that extra cost from its own pocket to protect customers for whom reservations already had been made.

On June 3, 1987, Pan Am told TCI that each "H-class" ticket that had not been written by June 6 would cost an additional $60. TCI already had booked 25,000 reservations on Pan Am flights scheduled to depart during the summer and early fall. Following its normal practice, TCI had "batched" these reservations so that tickets would be written two to three weeks before departure. We note, however, that Pan Am indicates that other wholesalers writing "H-class" tickets did not "batch" their tickets. TCI complained to Pan Am that it was impossible for the agency to write 25,000 tickets in three days, and Pan Am extended its deadline to July 3. By then, TCI, with Pan Am's assistance, had written and paid for 19,000 tickets. TCI paid the $60 per ticket increase for the remaining 6,000 tickets because it could not pass on the increase to passengers who already had paid for their tickets.[4]

TCI experienced a cash shortage in the fall of 1987, and failed to remit Pan Am $329,726.77 for tickets it sold, and passed along $75,000 in worthless checks. That October, Weiner and Levin met with Murphy and other Pan Am personnel to discuss TCI's financial problems. Pan Am agreed to allow TCI to pay it directly for several ARC reports, so that TCI could avoid defaulting with ARC, and sent in auditors to check TCI's books.

Pan Am also sent Steven Glasberg to review TCI's operations and finances, and to determine what assistance Pan Am should give TCI. Glasberg was a Pan Am System

---

**4.** These changes perhaps were unprecedented, but TCI was aware that "H-class" fares and restrictions could change at short notice.

Director of Budget and Analysis, but later became System Director of Sales and Market Development. Although Glasberg was a novice in the travel agency business, he nevertheless became TCI's primary contact with Pan Am. Weiner and Levin reported regularly and frequently to Glasberg on all of TCI's operations, finances, and cash flow, and on all of their marketing ideas. Glasberg directed TCI's operations and cash flow management for several months, and according to TCI, misled it into "believing that he knew what he was doing and that he was acting with the full support of Pan Am's top management."

Pan Am agreed to allow TCI to postpone paying the money it owed to the airline on the ARC reports and on certain dishonored checks TCI presented to Pan Am's ticket office. Pan Am also accepted TCI's $404,726.77 promissory note, due September 30, 1988.[5] TCI alleges that Glasberg told Weiner and Levin that "TCI would never have to pay the note because he was working up a 'marketing agreement' under which Pan Am would forgive the debt in exchange for an equity interest in TCI."

Pan Am regards TCI's 1987 financial troubles as self-inflicted—inflicted, *inter alia*, by TCI's inability to cope with the volume of business it received in 1987 and its strategy for increasing commissions wherein it over-sold its inventory of Pan Am "H-class" seats. TCI's practice of "batching," whereby it obtains full payment from customers months before it prints the tickets, exacerbated TCI's problems by preventing TCI from guaranteeing passengers a set fare.

Glasberg told TCI that he would help it develop new and profitable travel products. He drafted a marketing cooperation agreement between Pan Am and TCI, but Weiner and Levin rejected the first draft in December, 1987, because it gave Pan Am nearly complete control over TCI.

---

5. This note covered $329,726.77 in tickets sold, and $75,000 in worthless checks. See discussion, *supra.* Weiner and Levin rejected Glasberg's request that they personally guarantee this corporate debt.

In December, 1987, James Fannan, President of Soviet Pan American Travel Effort (SPATE), called Weiner and Levin. SPATE was a joint venture between Pan Am and Aeroflot, the Soviet airline, to develop tours to the Soviet Union. Fannan planned to offer those tours to wholesalers, who would market them to the public. He knew that TCI had experience in making charter tour arrangements to the Soviet Union. In view of TCI's financial problems, Weiner and Levin agreed to market the project, but refused to guarantee any specific volume of SPATE tour sales. Fannan developed nine different SPATE itineraries, and gave seven of them to TCI to market. The first of the tours was scheduled to leave in May, 1988, and TCI immediately developed brochures and began marketing them.

Pan Am alleges that despite TCI's cumulative losses and its large 1987 debt to Pan Am, Weiner and Levin "siphoned" TCI's corporate assets in the form of "loans" and "management fees" that they were not expected to pay back. Pan Am also indicates that in 1987 and 1988, Weiner and Levin improperly took $111,900 in "management fees" earned by TCI for work done for TDU. TCI countered this assertion by pointing to testimony to the effect that shareholder loans to Weiner and Levin began in the 1970s and that officers' loan accounts are common in closely-held businesses, that interest was charged, and that Weiner and Levin made periodic payments on those loans.

During January and February, 1988, Glasberg continued to talk about developing travel products, and TCI urged him "to firm up those products so that it could market them for Pan Am." Because of Glasberg's assurances, Weiner and Levin believed they were going to have "another bumper year."

Glasberg urged Weiner and Levin to hire a consulting firm to streamline their operations because in 1987 they had trouble handling TCI's large volume of business. The firm hired Michael Whitesage, President of PRISM Group, Inc., to review TCI's operations. Whitesage recommended that TCI transfer small specialty tour groups to TDU, Weiner

and Levin's retail travel agency and the parent of TCI, because it was better equipped to handle such groups. He also recommended that TCI focus exclusively on high-volume, bulk business. At Whitesage's behest, TCI also substantially upgraded its computer and telephone systems.

Glasberg continued to advocate the marketing cooperation agreement, promising Weiner and Levin "wonderful things once they signed." Weiner and Levin's understanding of the agreement was that TCI would be Pan Am's partner, and would receive favored treatment by having exclusive access to products. Weiner and Levin also believed that Pan Am probably would exercise its option to obtain TCI stock and forgive the promissory note. They believed that if they did not sign the agreement, TCI would lose the SPATE tours it was marketing, and other promised programs. Indeed, Weiner testified that Glasberg threatened to put TCI out of business if it didn't sign the agreement.

Weiner and Levin signed the marketing cooperation agreement on March 15, 1988. The parties agreed to the following: TCI acknowledged $329,726.77 and $75,000 in debt to Pan Am, which Pan Am was willing to defer in exchange for promissory notes. TCI promised to do everything reasonably necessary to market Pan Am's services. Pan Am would "utilize its best efforts to assist TCI in its marketing and sale of Pan Am services." The agreement included a non-exclusivity agreement, assumption of risk and indemnity clauses, and a force majeure clause. TCI agreed to treat Pan Am as its most favored supplier. Pan Am was given a stock purchase option at a set price, or, in Pan Am's discretion, for forgiveness of repayment of the amount owed. Pan Am had power to approve distributions during the stock option period. The agreement also contained restrictive covenants and Pan Am's, TDU's, and TCI's representations and warranties.

Pan Am alleges that Weiner and Levin acted to insulate TCI's assets from the $404,726.77 debt owed in the promis-

sory note: Weiner told TCI's former comptroller, Michael King, that a new company, TDI, had been established to insulate TCI and TDU from creditors. These allegations led to Pan Am's complaint that TCI was attempting to defraud it. According to TCI, however, TDI was incorporated in 1982—well before the events leading to this case.

During this period, Pan Am's management changed, and Thomas Plaskett was appointed its new president in January, 1988. Plaskett's new policy for the company involved marketing low-cost airline seats through retail agencies, thereby eliminating the airline's dealings with wholesalers such as TCI.

Before the parties signed the marketing cooperation agreement, Pan Am gave TCI prices for the summer of 1988, and the restrictions on "H-class" tickets. TCI began marketing those seats, first with a flyer, and then a full brochure.

There followed a series of revisions and amendments to Pan Am's ground rules for TCI in 1988. Pan Am withdrew TCI's authorization to sell flights to Eastern Europe after TCI printed and sent brochures to some 15,000 travel agents advertising travel to Eastern Europe, forcing TCI to tell travel agents responding to the brochure that it could not book the advertised seats. Pan Am told TCI that TCI could not take reservations more than thirty days in advance of departure, even though some of its competitors were allowed to do so. Pan Am also ordered TCI to stop using "electronic Q-ing," a method by which high-volume retail agencies obtain direct access to a wholesaler's computer to book reservations directly. This caused TCI to lose what it alleges was close to $1,000,000 in annual bookings. Again, Pan Am did not impose these restrictions on other wholesalers. Finally, Pan Am stopped TCI's practice of writing tickets through ARC, insisting that it write its tickets through Pan Am's City Ticket Office in Washington,

D.C. This required TCI to pay for tickets three weeks before they were written, instead of ten days afterwards.[6]

Pan Am also alleges that on June 24, 1988, Weiner directed TCI to report and remit to ARC only half the amount of the fares TCI owed to Pan Am. TCI paid other airlines in full. Weiner later directed that all Pan Am tickets would be written through TCI, "the shell company."

On July 1, 1988, Weiner directed that TDU's and TCI's assets and accounts were to be transferred to TDI. After that date TDU's sole function was to hold the ARC plates under which TCI traded as a branch office. Pan Am alleges that the transfer left TCI nothing with which to pay Pan Am. Pan Am was not notified of the transfer, even though TCI's promissory note was coming due in September, 1988, and even though the marketing cooperation agreement called upon TCI to disclose any asset transfer.

TCI ignored Pan Am's contract restrictions concerning ARC ticketing of "H-class" tickets, and the proscription on ticketing "H-class" outside of 30 days. TCI wrote large numbers of tickets and delayed reporting them. This deferred TCI's obligations to pay for the tickets, and allowed TCI to retain the money for those tickets. TCI also wrote and delivered tickets to passengers who had not yet paid in full.

Weiner and Levin scheduled a July 18 meeting with Pan Am to present a sales program. TCI indicated that Pan Am's changing policies had caused TCI considerable finan-

---

6. According to the appellant's brief,
 TCI objected, and ...
 Glasberg promised to arrange that either TCI would not have to ticket through the [City Ticket Office] or Pan Am would get cash back into TCI by reimbursing TCI for all of the money it owed on the [Sales Summary Adjustments (an agent's request for reimbursement for overpayments to ARC)] and [Lost Ticket Advice (an agent's request for reimbursement of a passenger's lost ticket)] that TCI had filed over the preceding year. Neither happened. Eventually, Weiner agreed that TCI would do a certain amount of [City Ticket Office (Pan Am's Washington, D.C. ticket office)] ticketing, but that it would ticket through ARC for any passenger scheduled to depart within 7 to 10 days.

cial problems and that TCI would go out of business if Pan Am did not assist it with the new travel products it presented to Pan Am. TCI did not disclose that it was continuing to purchase "H-class" tickets through ARC in violation of Pan Am's requirements and that it was remitting only half of what it owed to Pan Am. Nor did it disclose that TCI was writing tickets for unpaid reservations and that all of TCI's and TDU's assets had been transferred to TDI on July 1.

Glasberg called TCI the next day, praised its presentation, and indicated that Pan Am would act on TCI's proposals. Nothing happened, however, despite Weiner's and Levin's numerous calls to Murphy and Glasberg, which went unreturned.

By late July, Weiner and Levin had no confidence that Pan Am would honor reservations TCI had booked and "batched" to be ticketed later. TCI began writing tickets for passengers who had made reservations. TCI listed some of the tickets on its July 24 and August 7 ARC report, and paid for them in full. TCI listed the remaining tickets on its August 7 report, and listed more tickets on its August 14 report.

Pan Am alleges that TCI wrote checks to Pan Am in August knowing that it could not pay them. By the end of the reporting period on August 7, 1988, TCI owed Pan Am $1,295,150.29.

On August 17, TCI's Weiner, Levin, Whitesage, and Mark Pestronk (their attorney), met with Pan Am's Murphy, Garvett, Cooper, and others. TCI told Pan Am about the August ARC reports, for which it could not pay, and asked Pan Am to approve "direct form of payment" for those reports. It again presented Pan Am a proposal showing how TCI could repay Pan Am if Pan Am would cooperate. That meeting adjourned without resolution.

The parties held another meeting on August 23. Among those present were Pan Am's in-house counsel and its outside attorney, Paul Brown, and TCI's attorneys. Brown

conducted the meeting, and listed Pan Am's demands. He said that if TCI gave Pan Am a $50,000 deposit, Pan Am would agree to let TCI use "direct form of payment" for the August ARC reports, thereby allowing TCI to avoid default and forfeiture of the ARC plates.

The next day, TCI gave Pan Am a certified check for $50,000, and Pan Am allowed "direct form of payment" for the August 7 ARC report. It did not, however, do the same for the August 14 report, leaving TCI in default to ARC.

Pan Am retrieved its ARC plate from TDU, and filed suit against TCI on September 1, alleging that in 1987 and 1988, TCI sold several million dollars of Pan Am airline tickets that it refused to pay for, and that TCI retained commissions, and monies belonging to Pan Am. Pan Am also alleged that in 1988, TCI engaged in fraudulent conduct in an effort to avoid its obligations and insulate itself from liability.

TCI had continued to do business with SPATE, but Fannan withdrew SPATE's winter programs from TCI, explaining that he could not deal with TCI while Pan Am's suit was pending. Fannan wrote to TCI assessing it $250,000 in under-utilization penalties; in January 1989, SPATE filed suit in New York claiming $759,000 in under-utilization penalties. TCI denies having sales quota obligations to SPATE, but Pan Am alleges that SPATE passes to its tour operators all the terms and conditions of its contracts with INTOURIST, the Russian government's tourism agency that sets underutilization penalties.

The case leading to the appeals *sub judice* was tried for three weeks, during which the jury considered Pan Am's fifteen-count complaint against TCI, TDU, TDI, Weiner, and Levin, as well as TCI and TDU's fourteen-count counterclaim. On October 11, 1990, judgments were entered in the amounts of $404,726.77 against TCI, and $1,570,083.26 against TDU, TCI, Weiner, and Levin. The judgments later were corrected to include a $1,974,810.03 judgment against TDI on count fourteen of the Fifth Amended Complaint.

TCI, et al., noted this appeal on November 9, 1990, requesting this court to reverse the lower court, and asking us to answer the following questions.

I. A. Where a jury renders irreconcilably inconsistent special verdicts and the court dismisses the jury without requesting it to reconcile the verdicts, must the court order a new trial?

B. May a trial court rearrange a jury's special verdict in order to award a party more damages than the jury could validly have awarded?

II. Where a jury has affirmatively and consistently found no fraud to have been committed by corporate officers and stockholders, may the court nevertheless pierce the corporate veil to impose liability on the individuals?

III. Can a fiduciary duty be found even though no such duty was imposed by contract or custom?

IV. Can a JNOV be entered where there is competent evidence in support of the jury verdict?

V. Can an airline collect a debt based on a contract that violated federal law by virtue of the carrier's failure to file tariffs with the regulatory authorities?

VI. Were the trial court's rulings on the Counterclaim wrong?

Pan Am noted a cross appeal on November 16, 1990, and asks:

I. Is a trial court entitled to use its discretion in applying the conclusions of a jury on a special verdict sheet to the counts brought by parties in the case, as long as it does so consistently?

II. A. May a trial court pierce the corporate veil of a corporation to impose liability in order to enforce a paramount equity?

B. Did the Trial Court err in rejecting fraud as a basis for piercing the corporate veil?

III. Can a fiduciary duty be found where a formal trust exists and where the relationship between the parties is that of principal to agent?

IV. Is a party prevented from raising as an affirmative defense to the allegations of a state court civil proceeding an issue that has been reserved to the exclusive jurisdiction of the federal courts?

V. Did the Trial Court err in failing to enter judgment against TDU, Weiner and Levin on Count 2 (Promissory Note) and against all Defendants on Count 7 (Conversion) and Count 11 (Breach of Contract)?

VI. Did the Trial Court err in dismissing Count 8 of Pan Am's Fourth Amended Complaint?

VII. Did the Trial Court err in not submitting the issue of punitive damages to the jury, where, on the basis of the evidence adduced at trial, a reasonable person could find that the Defendants acted with malice and fraud?

VIII. A. Did the Trial Court err in neglecting to award pre-judgment interest on the amounts owed to Pan Am by reason of Defendants' failure to remit proceeds from the sale of tickets?

B. Should the pre-judgment interest rate applied to the unremitted monies be compounded, given the fiduciary duty owed by the Defendants to Pan Am with respect to those monies?

IX. Is an award of attorney's fees to the Plaintiff appropriate when such fees are expressly provided for in a promissory note?

We now move to the task of answering these questions, addressing them in turn.

## I. VERDICT ISSUES

### A.

[This addresses TCI's I.A & B, and Pan Am's I]

TCI argues that the jury's verdicts on Sections I, II, and III of the special verdict sheet are so irreconcilably incon-

sistent with one another and with the judge's instructions, that they cannot be allowed to stand.

The verdict sheet, prepared by the trial judge, posed the following interrogatories to the jury.

I February 19, 1988 Promissory Note

A. Which—if any—of the defendant(s) is/are liable?

| | | Yes | No |
|---|--------|-----|----|
| 1.| TCI | x | |
| 2.| Mr. Levin | | x |
| 3.| Mr. Weiner | | x |
| 4.| TDU | | x |

B. Are there any credits credits [sic] against this obligation?
 YES, in the amount of $ _____
 NO _____

II Breach of Marketing Cooperation Agreement

A. Was there a breach of the [Marketing Cooperation Agreement]?
 YES x
 NO ___

B. Which—if any—of the defendant(s) is/are liable?

| | | YES | NO |
|---|--------|-----|----|
| 1.| TCI | x | |
| 2.| Mr. Levin | x | |
| 3.| Mr. Weiner | x | |
| 4.| TDU | x | |

C. What amount of damages resulted?
 $ 0

III Debts shown on the August, 1988 ARC Reports

A. do you find for the plaintiff or for the defendants?
 1. for the plaintiff in the amount of
 $ 1,570,083.26
 2. for the defendants 0

B. which of the defendants is liable?

| | | YES | NO |
|---|--------|-----|----|
| 1.| TCI | x | |
| 2.| Mr. Levin | x | |
| 3.| Mr. Weiner | x | |
| 4.| TDU | x | |

C. Additional Credits Against ARC Obligation

| | | NO | YES in the amount of |
|---|--------|----|----|
| 1.| [Lost Ticket Advice] | x | $ |
| 2.| debit memos | x | |
| 3.| unrefunded deposits | x | |

| | NO | YES in the amount of |
|---|---|---|
| 4. sales summary adjustments | x | _____ |
| 5. other refunds | x | _____ |
| TOTAL | | $_____ |

---

The remaining questions asked the jury to determine whether Levin and Weiner conspired to defraud Pan Am, and whether the transfer of management fees and the transfer of TDU's assets to TDI was fraudulent. The jury answered in the negative to both questions.

As to the counterclaim, the jury concluded that Pan Am breached the marketing cooperation agreement. It found that Pan Am improperly interfered with the contract relationship between TCI and SPATE, but that this did not induce the litigation. It found damages in the amount of $500,000.[7]

The marketing cooperation agreement contains the following provision:

17. *Option Period.* TCI, TDU and the Principals represent, warrant and agree that, during the entire period between the date hereof and the exercise of the Option, if at all or termination, whichever is earlier (the "Option Period"):

. . . . .

(I) all expenses, taxes, fees and all other liabilities of whatsoever kind for which TCI shall become liable in the operation of its business or otherwise will be timely paid;

. . . . .

Pan Am argued that because Levin and Weiner signed the agreement as individuals, and in their corporate capacity, this paragraph constituted Levin's, Weiner's, and TDU's guarantee of TCI's obligations (hereinafter the guarantee theory), including TCI's obligation to pay the $404,726.77 promissory note. *See* Pan Am's Fifth Amended Complaint,

---

7. As we shall see, *infra,* the trial court struck this damage award.

Count Two. The jury, however, found only TCI liable for the promissory note.

Pan Am also argued that TCI breached the marketing cooperation agreement and the Net Ticketing Agreements (setting prices and restrictions on tickets bought in bulk), and that the same marketing cooperation agreement, quoted *supra*, obligated TDU, Levin, and Weiner to pay the debts incurred as a result of TCI's breaches. TCI's alleged breaches included, *inter alia*, underremitting monies due Pan Am, granting refunds of non-refundable tickets, failing to report sales and retaining the proceeds, failing to collect taxes, failing to turn over financial information on a timely basis, failing to conduct ticketing through Pan Am's Washington, D.C. City Ticket Office (rather than through ARC), failing to remit payments for tickets sold in July and August of 1988, and underremitting monies for periods in June and July. The amounts involved were $1,295,150.29 for the ARC report week ending August 7, 1988, and $342,893.63 for the ARC report week ending August 14, 1988. *See* Pan Am's Fifth Amended Complaint, Count Three.

Pan Am additionally charged that TCI owed it $1,295,-150.29 for the tickets it sold through ARC between August 1 and August 7. Unable to pay ARC, TCI negotiated with Pan Am for a "direct form of payment" for this amount, but never paid it. Pan Am argued that the same marketing agreement provision made TDU, Levin, and Weiner liable for this debt. *See* Pan Am's Fifth Amended Complaint. We point out that this count duplicates one of the allegations contained in the previous count.

The jury found that TCI, Levin, Weiner, and TDU breached the marketing cooperation agreement, but that no damages resulted from this breach. *See* Verdict Sheet Section II. The jury also found that TCI, Levin, Weiner, and TDU were liable in the amount of $1,570,083.20 for TCI's failure to pay the August 1988 ARC reports for which Pan Am had agreed to accept "direct form of payment." *See* Verdict Sheet Section III.

TCI argues that these results are irreconcilably inconsistent with each other and with the judge's instructions. It argues that the jury necessarily rejected Pan Am's argument that the marketing cooperation agreement's section 17(I), see *supra,* page 146, made TDU, Levin, and Weiner liable for TCI's debts when it found that they were not liable for TCI's promissory note. Given this, the jury could not conclude that TDU, Levin, and Weiner *were* liable for the August ARC report debt. TCI also argues that Levin, Weiner, and TDU could not be liable for the August 1988 ARC report unless it was by virtue of breaching the marketing cooperation agreement, and because the jury found that although they breached the agreement, no damages resulted, its conclusion that they were liable is erroneous.

Pan Am counters this by arguing that even if the jury in Section I rejected Pan Am's guarantee theory derived from section 17 of the marketing cooperation agreement, and this barred the jury's use of that theory in Sections II and III, this would not prevent the jury from using other theories to find TDU, Levin, and Weiner liable. They paint the following possible scenarios.

TCI signed the promissory note for which the jury found it liable in Section I; Weiner, Levin, and TDU did not sign the promissory note. The jury in Section I therefore could have concluded that TCI alone was liable for the note. Weiner, Levin, and TDU signed the marketing cooperation agreement in their personal capacities as well as in their corporate capacities, and the jury might have concluded from this that they were responsible for breaching this agreement, as per Section II, but not financially responsible for the promissory note.

Likewise, Pan Am argues that if the jury rejected its guarantee theory, it might have imposed liability in Section II (for breach of the marketing cooperation agreement) upon Levin, Weiner, and TDU, on the basis that they breached their fiduciary duty, or upon a conversion theory, or upon a theory of piercing the corporate veil. Any of

these would reconcile the Section II finding with the Section I finding.

Finally, Pan Am argues that Sections II and III of the verdict are not inconsistent: TCI has "mixed and matched the issue of damages with that of liability. A finding of no damages in Section II does not affect the jury's conclusion that all four defendants were liable for breach of the MCA. That finding is, in turn, completely consistent with the jury's finding in Section III that all four defendants were liable for debts shown on the August 1988 ARC reports." Pan Am adds that in Section IIIA, the jury intended to identify the exact basis for Pan Am's recovery.

■ Ordinarily, this court will not interfere with a jury verdict, even one that is inconsistent. As we indicated in *Eagle–Picher v. Balbos*, 84 Md.App. 10, 578 A.2d 228 (1990), *cert. granted*, 325 Md. 248, 600 A.2d 418 (1992):

> Inconsistent jury verdicts generally are not sufficient grounds for an appellate court to reverse a jury's verdict. As the Court of Appeals stated[,] ... 'That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters.'
>
> In so holding, we realize that this precedent had previously been applied by Maryland courts only in criminal cases. We believe, however, that the rationale for this principle is equally valid when applied in civil actions. Here too, we are reluctant 'to interfere with the results of unknown jury interplay' at least without proof of 'actual irregularity.' We recognize that inconsistency may be the product of lenity, mistake, or a compromise to reach unanimity. The continual correction of such matters would undermine the historic role of the jury as the arbiter of questions put to it.

*Id.* at 35–36, 578 A.2d 228 (citations omitted). The court may act, however, when the jury's verdict is irreconcilably defective. *See S & R v. Nails*, 85 Md.App. 570, 590, 584 A.2d 722 (1991) (*e.g.*, an irreconcilably defective verdict is

one in which one of the jury's answers to a question in a special verdict form would require a verdict for the plaintiff, and another answer would require a verdict for the defendant).

We do not find Sections I and II of the jury's verdict irreconcilably inconsistent. The jury might plausibly conclude that TCI alone was liable on the note because the signature of one of its officers, in his corporate capacity, was the only one appearing on the note. Likewise, the jury might well conclude that all of the defendants (TCI, TDU, Levin, and Weiner), having signed it, breached the marketing cooperation agreement—Levin signed for TCI and TDU, then Weiner and Levin each signed for himself, making themselves personally liable. *See Lanier v. Bank of Virginia–Potomoc*, 39 Md.App. 589, 595, 387 A.2d 614 (1978) ("where an officer of a corporation endorses his name to a promissory note with the addition of his official title but without the name of the corporation or a designation of whom he is acting in a representative capacity for, he is prima facie personally liable") (citing *Belmont Dairy Co. v. Thrasher*, 124 Md. 320, 92 A. 766 (1914)).

The trial judge's instructions are consistent with the theory that the jury might have been persuaded to find liability based upon who signed each of the documents. In reviewing the verdict sheet for the jury, the judge illustrated his instructions with the following hypothetical:

So, let's say for example—this is only a for example. Let's say you are persuaded that the Travel Committee Inc. signed the Note and let's say you are persuaded that Mr. Levin and Mr. Weiner also signed the Note in their individual capacities and that the Travel Destinations Unlimited is also responsible by virtue of the Note itself, if you are persuaded by a preponderance of the evidence that those facts are so, you would answer yes to that question unless you are also persuaded that there was a subsequent forgiveness of that Note. The burden of proving forgiveness of the Note would be on the Defendants.

So, your answer would be yes, if you are persuaded that the Note was signed by these individuals in a capacity that would find these individuals, your answer would be yes to question I A.1.; A.2.; A.3.; A.4. If you are persuaded that they signed the Note in a way that makes them binding. Your answer would be no if you are either not persuaded that the particular Defendant signed the Note in a way that makes it binding against that Defendant or if you are persuaded by the defense evidence that the Note was subsequently forgiven.

Given this, we do not find any inconsistency of the magnitude that would lead us to disturb the jury's verdict: the jury could have determined the parties' liability on the basis of their signatures to the two documents in issue.

■ The apparent inconsistency among the jury's findings in Sections II and III arises from the assumption that the jury's verdict sheet sections align with particular counts in Pan Am's complaint which, if true, would suggest that the jury's rejection of Pan Am's guarantee theory, as narrated in counts two and three of its complaint, make it impossible for the jury to simultaneously conclude that TDU, Levin, and Weiner are liable for the August ARC reports. We see no reason, however, to interpret the verdict sheet as an item by item account for Pan Am's complaint. The rule governing special verdicts does not require this kind of alignment, and the document's structure suggests that the judge arranged its format to logically cover factual issues raised, without submitting each allegation of the complaints as drafted by the parties. The judge indicated that, "It is my duty to instruct you with respect to all of the issues that you will be working with. That's why I prepared the verdict sheet."

Another issue that concerns us is the apparent inconsistency between the jury's finding that the defendants' breach of the marketing cooperation agreement did not result in damages and its finding that the defendants were liable to Pan Am in the amount of $1,570,083.26 for debts reflected in the August ARC reports. A threshold issue hinges upon

whether the jury's numbered findings correspond precisely to Pan Am's complaint and thus convey the jury's implicit rejection of Pan Am's guarantee theory. For the reasons stated above, we do not think that the judge intended the verdict sheet to align with Pan Am's complaint.

■ Nevertheless, we think that the defendants could not be simultaneously liable for the ARC-related debts and not liable for damages associated with their breach of the marketing cooperation agreement. We pause again to examine the judge's instructions to the jury. He said that:

> The fact that you make a particular finding on any of these issues in this verdict sheet should not control the finding you make on another issue. All of the evidence has been presented in the sense that you will be evaluating all of the evidence, but you would not, for example, say we made a certain finding on page one so obviously we'll do something different on page three or we will simply check off a certain thing on page three. You give each issue your individual attention. The fact that you have made a certain finding in one place doesn't mean that you must, therefore, automatically make a certain finding elsewhere.

We point out that the defendants could have breached the marketing cooperation agreement in various ways, and the judge's instructions to the jury reflect this.

> So, if you are persuaded by a preponderance of the evidence that there was a breach of the Marketing Cooperation Agreement, you answer the question yes. Then you go to the second page and you identify at the top of the second page here B. 1. through 4. which of the Defendants you are persuaded violated the Marketing Cooperation Agreement.
>
> You have heard evidence that the Marketing Cooperation Agreement was breached by the Defendants in a number of ways: failure to ticket as they agreed to ticket, failure to remit monies that they were obliged to remit, and so forth.

It is not difficult to imagine that the jury determined that the defendants breached this agreement on some count that did not cause damage.

The jury's conclusion in Section III, which repeats one of the allegations in Section II concerning the ARC report is troubling, however, because one would expect these to be subsumed under the previous allegations. Absent evidence that the defendants undertook responsibility for the ARC reports in some capacity other than the one spelled out in the marketing cooperation agreement, we cannot see how they breached the one, but caused no damage, and yet are liable on the other.

■ Nevertheless, we conclude that although inconsistent, the verdicts are not irreconcilable to an extreme that impels us to reject the jury's finding. As we have seen, *supra*, an irreconcilably inconsistent verdict is one that compels a finding for the plaintiff, on the one hand, but also compels, *on the same issue*, a finding for the defendant. For example, the jury could not find that both parties breached the same marketing cooperation agreement provision. The trial judge made this plain in offering his instructions to the jury as to TCI's counterclaim. He told jurors that if they were "satisfied that it was the Defendants who breached the agreement, then you would also be persuaded that Pan Am did not and your verdict would be no on the issue of breach." Puzzling though it is, we do not find the jury's decision in Section III hopelessly irreconcilable with its decision in Section II.

### B.

■ TCI also argues that the court entered what amounted to a *de facto* judgment notwithstanding the jury's verdict when it reformed the jury's verdict by entering a $1,570,-083.26 judgment in Pan Am's favor as to count three of its complaint instead of on count four of the complaint. Count three alleged that TCI breached the marketing cooperation agreement and the net ticket agreements and that TDU,

Levin, and Weiner were liable for this by virtue of the agreement's paragraph 17(I). Count four claimed $1,295,-150.29 for TCI's failure to remit that amount pursuant to the August 7 ARC report.

We point out that according to the August 7, 1988 ARC report, TCI owed Pan Am $1,295,150.29, and at first glance the jury's decision in Section III to award Pan Am $1,570,-083.26 is perplexing. Indeed, Pan Am's count four asks for the lesser amount.

Again, however, we think it wrong to assume that the verdict sheet's queries were intended to address Pan Am's complaint one item at a time. Specifically, we see no reason to require that the jury's answer in Section III A correspond to Pan Am's count four. The verdict sheet asked the jury to determine the amount owed, if any, for "[d]ebts shown on the August, 1988 ARC Reports." Importantly, the verdict sheet does not specify an ARC report date, of which there were two in August. The jury reasonably could make a damage assessment that included both reports, as complained of in Pan Am's count three alleging that TCI failed to remit $1,295,150.29 for the August 7 report, and $342,893.63 for the August 14 report. The judge's entry of judgment on count three was not improper.

### C.

█ Finally, TCI argues that we should reverse the court's entry of judgment on Pan Am's count three, and the jury's award of damages on Pan Am's count four, to accord with Pan Am's count four claim for damages in the amount of $1,295,150.29. The reader will recall that the jury awarded Pan Am $1,570,083.26 in Section III of the verdict sheet, and that TCI argues that this award corresponds to count four of Pan Am's complaint, and that the judge improperly reformed this award in attributing it as responsive to count three of the complaint.

In *Scher v. Altomare*, 278 Md. 440, 442, 365 A.2d 41 (1976), the Court of Appeals indicated that a plaintiff's

recovery may not exceed the sum claimed in the *ad damnum* clause, or the damage actually proved. Nevertheless, in light of our finding, *supra,* that the jury's award need not be confined to a particular count of Pan Am's complaint, we need not conform the damage amount to the *ad damnum* clause in Pan Am's count four. We distinguish the case *sub judice* from *Scher* on the ground that the plaintiff in *Scher* argued only one theory of recovery, whereas the results on the verdict sheet plausibly could reflect the jury's determination as to more than one of Pan Am's complaints.

## II. PIERCING THE CORPORATE VEIL

[This addresses TCI's II and Pan Am's IIA & B]

■ TCI contends that because the jury found that TCI's corporate officers and stockholders committed no fraud, the trial judge improperly pierced the corporate veil.

Pan Am's complaint, count fourteen, alleged that Levin and Weiner, personally and in their capacities as TCI's, TDU's, and TDI's officers and directors, engaged in conduct designed to defraud Pan Am. They charged, *inter alia,* that Levin and Weiner's false representations that TCI would pay its debt to Pan Am induced Pan Am to accept TCI's promissory note, to agree to allow TCI "direct form of payment" for monies owed through the ARC, and to enter into the marketing cooperation agreement and net ticketing agreements. Additionally, Pan Am alleged that Levin and Weiner directed TCI to write large Pan Am ticket orders through ARC even though they knew that TCI could not pay for the tickets. Significantly, Pan Am also claimed that Levin and Weiner transferred substantially all of TDU's assets to TDI, leaving TCI and TDU unable to meet their obligations to Pan Am. Pan Am claimed $2,600,000 in damages and asked the trial court to "prevent this fraud, or in the alternative, to enforce paramount equity" by piercing TCI's, TDU's, and TDI's corporate veils to hold Levin and Weiner personally liable. *See* Pan Am's Fifth Amended Complaint, Count Fourteen.

The trial judge indicated that:

[I]t seems to me under the tests of piercing the corporate veil that now apply to successor corporations, and I rely on the language in Miller versus Nissen,[8] . . . it seems to me in accordance with the jury's verdict and the evidence presented in this case, that a judgment should be entered as to Count 14 in favor of all—in favor of Pan Am against all defendants, TDU, TCI, TDI, Mr. Levin and Mr. Weiner and that the judgment under Count 14 should be in the amount of one million, nine hundred and seventy-four thousand, eight hundred and ten and three cents. That represents the promissory note of $404,726.77 and the ARC reports that total one million, five hundred and seventy thousand, eighty-three dollars and twenty-six cents. My calculation, if my math is right, brings the amount of the judgment to one million, nine hundred and three cents. So a judgment is entered in Count 14 against all of the defendants in favor of the plaintiff in that amount.

This is the sum of the awards derived from Sections I and III of the verdict sheet.

TCI points out that the jury rejected Pan Am's allegations that Weiner and Levin conspired to defraud Pan Am and fraudulently transferred TCI's and TDU's assets. *See* Verdict Sheet, Sections IV and V. And it notes that absent a finding of fraud, "no Maryland court has pierced the corporate veil." Therefore, TCI argues, no defendant could be held liable under count fourteen.

Pan Am counters by alleging that Levin's and Weiner's conduct was in fact fraudulent, and that even if it weren't, the trial court could pierce the corporate veil for other reasons—namely, to enforce paramount equity.

We disagree with Pan Am's argument insofar as it touches upon the court's ability to pierce the corporate veil for reasons other than fraud. We shall explain.

---

**8.** The judge refers to *Miller v. Nissen Corp.,* 83 Md.App. 448, 575 A.2d 758 (1990), *rev'd* at 323 Md. 613, 594 A.2d 564 (1991), in which this court addressed successor corporate liability for dangerous or defective products.

Corporations usually are separate and distinct from their shareholders, insulating those shareholders from liability. Nevertheless, in certain circumstances, a court will "lift the corporate veil" to impose personal liability.

A court may lift the corporate veil to find the principals liable if there has been a fraud. The verdict sheet indicates the jury's conclusion that Levin and Weiner did not conspire to defraud Pan Am, and they did not fraudulently convey management fees or TDU's assets. The jury heard three weeks of testimony and reviewed scores of documentary exhibits on both sides of this issue, and we must accept its verdict that Levin and Weiner were not guilty of fraud. *DiLeo v. Nugent*, 88 Md.App. 59, 76, 592 A.2d 1126 (1991) ("In making a determination or finding of fact, a jury assesses and evaluates the weight to be assigned to the evidence presented to it and decides its effect. Neither the trial court nor this Court is permitted to substitute its evaluation of the evidence for that of the jury. To do so would be an invasion of the jury's province.").

■ But Pan Am argues that fraud is not the only ground for piercing the corporate veil, and it is to this argument that we turn.

The Court of Appeals occasionally alludes to enforcing a paramount equity as an alternate justification for setting aside the corporate fiction. *See Bart Arconti & Sons, Inc. v. Ames–Ennis, Inc.*, 275 Md. 295, 340 A.2d 225 (1975), in which the Court of Appeals indicated that:

Although a number of variations upon the same theme may be found, the most frequently enunciated rule in Maryland is that although the courts will, in a proper case, disregard the corporate entity and deal with substance rather than form, as though a corporation did not exist, shareholders generally are not held individually liable for debts or obligations of a corporation except where it is necessary to prevent fraud or enforce a paramount equity.

*Id.* at 310, 340 A.2d 225 (citations omitted). *See also Dixon v. Process Corp.,* 38 Md.App. 644, 654, 382 A.2d 893 (1978) ("Maryland law is crystalline 'that the corporate entity will be disregarded only when necessary to prevent fraud or to enforce a paramount equity.' "); *See "Piercing the Corporate Veil" in Maryland: An Analysis and Suggested Approach,* 14 U.B.L.Rev. 311, 324–25 (1985) (tracing history in Maryland and collecting cases).

Notwithstanding its hint that enforcing a paramount equity might suffice as a reason for piercing the corporate veil, the Court of Appeals to date has not elaborated upon the meaning of this phrase or applied it in any case of which we are aware. We note, however, that the *Arconti* court declined to find a paramount equity even in a case in which the three corporations commingled equipment, operated from a single place of business, permitted one corporation to become dormant as the other two corporations improved, and made personal loans and transferred insurance policies to the principals. *Arconti,* 275 Md. at 309, 340 A.2d 225.

None of this bodes well for Pan Am's argument, and our review of the approaches taken in other jurisdictions supports our inclination to find that the trial court erred in piercing the corporate veil. We here examine the factors outlined in a Fourth Circuit Court of Appeals decision, *DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.,* 540 F.2d 681 (4th Cir.1976), because our survey indicates that its list represents factors used elsewhere to establish a paramount equity. The court wrote that:

> [E]qually as well settled as is the principle that plain fraud is not a necessary prerequisite for piercing the corporate veil is the rule that the mere fact that all or almost all of the corporate stock is owned by one individual or a few individuals, will not afford sufficient grounds for disregarding corporateness. But when substantial ownership of all the stock of a corporation in a single individual is combined with other factors clearly supporting disregard of the corporate fiction on grounds of fundamental equity and fairness, courts have experienced

'little difficulty' and have shown no hesitancy in applying what is described as the 'alter ego' or 'instrumentality' theory in order to cast aside the corporate shield and to fasten liability on the individual stockholder.

*Id.* at 685 (citations omitted). The court recounted other factors that weigh in the analysis. These include: whether the corporation was grossly undercapitalized, the corporation's failure to observe corporate formalities, non-payment of dividends, the debtor corporation's insolvency, the dominant stockholder's siphoning of corporate funds, the non-functioning of other officers or directors, the absence of corporate records, and the corporation's status as a facade for the stockholders' operations. *Id.* at 686–87.

We find no evidence that the corporations here involved failed to observe corporate formalities or pay dividends. The officers and directors are involved in corporate activities, and no one suggests that corporate records are absent. Pan Am alleged that Levin and Weiner siphoned corporate funds for their own use, but evidence to the contrary also was submitted. *See* Comment, *supra,* 14 U.B.L.Rev. at 319 (elaborating upon the "Many Factors Approach").

We cannot on the record before us justify disregarding the corporate entity. The jury concluded that Levin and Weiner did not act fraudulently, and the evidence does not suggest that lifting the veil is necessary to enforce a paramount equity. We therefore find erroneous the trial court's decision to pierce the corporate veil. We note that this will be scant solace to the individuals, however, in that they still are liable under the marketing cooperation agreement because they signed that document in their personal capacities.

### III. FIDUCIARY DUTY

[This addresses TCI's argument III
and Pan Am's argument III]

Pan Am's complaint alleged that TCI had a fiduciary obligation to hold and preserve ticket sale proceeds for Pan Am's benefit, and to remit these to Pan Am after

deducting its own commissions and fees. Pan Am alleged that TCI's failure to remit those funds, and TCI's and TDU's breach of the marketing cooperation agreement and the Net Ticket Agreements, each constitute a breach of fiduciary duty.

The issue did not reach the jury, but the judge endeavored to "conform" the jury's Section II verdict to the counts of the claim and the counterclaim. He entered judgments in the amount of $1,570,083.26 in counts four and six against TCI, TDU, Levin, and Weiner. On October 11, he rejected TCI's argument that the relationship was a debtor/creditor relationship, and reaffirmed his earlier decision. He said that "I'm persuaded of a couple of things, that as of this moment I'm alive and that there is a fiduciary duty in this case.... Clearly there is a fiduciary duty here. There has to be a fiduciary duty. If this isn't a fiduciary case, what is one?" (The judge reiterated this sentiment a number of times.)

TCI argues that neither ARC nor the airlines believe that the ARC agent reporting agreement creates a fiduciary relationship between agencies and airlines, in spite of language in the agreement that might suggest otherwise. The agreement provides that:

> The agent shall designate a bank account for the benefit of ARC and the carrier for deposit of the [sale] proceeds.... The Agent recognizes that the proceeds of the sales, less the Agent's commissions, on these ARC traffic documents are the property of the carrier and shall be held in trust until accounted for to the carrier.
>
> . . . . .
>
> All monies and credit card billing documents, including any special "direct form of payment" credit documents which a carrier has expressly authorized, less applicable commission, collected by the Agent for sales hereunder are the property of the carriers.

Agent Reporting Agreement, Sections VII(B) & VIII(A)(5).

The distinction between debtor-creditor relationships and fiduciary relationships is significant for TCI: its liability on

this issue hinges upon how its relationship to Pan Am is characterized. The gist of TCI's argument is that the fiduciary relationship does not exist because ARC does not require agents to segregate ticket sale funds, and ARC commingles funds it draws from agents' accounts: ARC only requires that the agency's designated account contain sufficient funds when ARC presents its draft. TCI argues that absent an ARC prohibition against commingling that would demonstrate otherwise, the parties intended to establish a debtor-creditor relationship, and not an agency relationship that would produce a fiduciary obligation. It gleans additional support from the marketing cooperation agreement, which provides that TCI must pay Pan Am interest for any amount it owes but does not remit in full.

A variety of circumstances may give rise to a fiduciary relationship, but the relationship between a principal and an agent perhaps is one of the most common. Pan Am argues that the defendants are travel *agents*, and that their status as agents is illustrated by their obligation to hold in trust for the airlines funds they collect from ticket sales. Pan Am adds that TCI breached its fiduciary duty to Pan Am when the defendants sold more than three million dollars in tickets, even though they knew that they could not pay for them, and urges us to affirm the trial court's entry of judgment on count six.

We first must determine whether a fiduciary relationship existed, then turn to consider whether the trial judge reasonably concluded that TCI breached its duty to Pan Am.

A fiduciary relationship is one in which one party must act for the other's benefit concerning matters within the scope of the relationship. An agency-principal relationship is a species of fiduciary relationship, and an agent's duty to her principal is similar to the duty imposed in fiduciary relationships. *See* Restatement (Second) of Agency § 387.

Although not clearly defined, Maryland case law suggests that the term is left deliberately vague to avoid a too

narrow definition, excluding circumstances from which a fiduciary relation might spring.

> A 'fiduciary' or confidential relation, when used in the same connection, exists 'in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interest of the one reposing the confidence. The rule embraces both technical fiduciary relations, and those informal relations which exist wherever one man trusts in and relies on another; the origin of the confidence reposed is immaterial.'

*Anderson v. Watson,* 141 Md. 217, 234, 118 A. 569 (1922) (quoting *Highberger v. Stiffler,* 21 Md. 338 (1864); *Peoples v. Ault,* 128 Md. 401, 97 A. 711 (1916)). The Court of Appeals in *Gerson v. Gerson,* 179 Md. 171, 177–78, 20 A.2d 567 (1941) indicated that:

> In *Chase v. Grey,* 134 Md. [619] at page 623, 107 A. [537] at page 538, we said: "... 'Courts of equity have carefully refrained from defining the particular instance of fiduciary relations in such a manner that other and perhaps new cases might be excluded. It is well settled by an overwhelming weight of authority that the principle extends to every possible case in which a confidential relation exists as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other. The relation and duties involved in it need not be legal; it may be moral, social, domestic, or merely personal.' "

 We first consider Pan Am's claim that the ARC agreement's provisions concerning TCI's obligation to hold funds in trust create or evidence a fiduciary duty. We discern no Maryland cases on point, but federal bankruptcy cases [9] suggest that this provision's presence does not cre-

---

9. We note the limited utility of the federal bankruptcy cases because they are confined to the federal statute involved. Neither party pointed this out.

ate a trust. *See In re Chick,* 53 B.R. 697 (Bankr.D.Or. 1985).

The court in *Chick* considered whether the debtor travel agency's debt was dischargeable under federal bankruptcy law. The background facts in that case resemble those in the case *sub judice:* a sales agreement authorized a travel agency to sell airline tickets. The sales agreement required the agency to hold sales proceeds in trust for the airlines, and to report its sales to the trade association representing the airlines. That agency would in turn draw checks to reimburse the airlines upon the agency's account. The sales agreement did not require agencies to establish separate trust accounts for sales proceeds. The court rejected the plaintiff's argument that the sales agreement provision similar to the one in issue here *created* a fiduciary relationship. *Id.* at 702. *See also In re Paley,* 8 B.R. 466 (Bankr. E.D.N.Y.1981). We point out, however, that merely because it did not create such a relationship and concomitant duty, does not mean that such a relationship could not exist.

Ordinarily, an agent must segregate its principal's funds and property. The Restatement (Second) of Agency § 398 states that:

Unless otherwise agreed, an agent receiving or holding things on behalf of the principal is subject to a duty to the principal not to receive or deal with them so that they will appear to be his own, and not so to mingle them with his own things as to destroy their identity.

Comment c. informs us, however, that:

[i]n the case of certain professional agents, such as auctioneers and factors,[10] it is customary, and hence ordinarily understood, that the agent can properly mingle his funds with those of his principal. The business expediency of so doing is especially clear where the amounts received by the agent are small or where there is a series of transactions, in which cases it is usually inconvenient

---

10. A factor is an agent.

for the agent to keep the fund separate either in specie or by a separate account in a bank. If the funds are properly mingled, the inference is that the agent becomes a debtor to the amount received for the principal, but that he agrees to maintain enough in the fund to pay the principal, who has a charge upon the fund to the amount of the debt. It may be understood that an agent is privileged to mingle the funds or fungible goods of various principals, as where a collecting agent has an account with a bank in which he keeps the funds of all of his clients....

The record amply supports the conclusion that commingling funds is common practice in this industry. The fact that the ARC agreement does not require agencies to segregate the monies they collect for ticket sales illustrates that commingling is common agency practice. We therefore find erroneous TCI's argument that commingled funds negate the possibility that a fiduciary relationship existed.

More telling is the argument that an agency's liability for interest on late payments indicates the presence of a debtor-creditor relationship instead of a fiduciary relationship. TCI cites *Dunlop Sand & Gravel v. Hospelhorn*, 172 Md. 279, 191 A. 701 (1937), in which the Court of Appeals considered whether a fund deposited with a trust company was a trust, or whether the trust company's relationship to the depositor was as a debtor. The fund was intended as a guarantee to insure a vendor's compliance with a sales contract containing a non-competition clause. The agreement allocated annual interest to the depositor. We point out, though, that the court considered the trust company's dual role as a trust business and as a banking business, and that the agreement manifested the parties' intent to transfer the funds to the trust company not as a trustee, but as a bank. *See id.* at 286, 191 A. 701.

In discussing the transaction's context, the court indicated that:

[a] circumstance of vital importance was that the depositary was to pay interest on the deposit. Interest is ordinarily regarded as a price paid for the use of money, and, unless a contrary intent is manifested, it is implicit in a contract to pay interest that the promisor shall have the right to use the money on which the interest is paid as his own, in order to earn the money with which to pay it, subject only to the obligation of repaying it when called upon, in accordance with the terms of the deposit. The right to so use the fund necessarily means that title to the fund passes to the depositary, that the fund deposited becomes indistinguishably fused with the general funds of the depositary, and that the relation between the depositary and person entitled to demand the amount of the deposit from the depositary, that of debtor and creditor.

*Dunlop,* 172 Md. at 287, 191 A. 701.

We find this controlling and conclude, therefore, that TCI's obligation to pay interest for late payments reflects its status as a debtor and not a fiduciary. Consequently, neither TCI nor TDU owed Pan Am the heightened duty called for by a fiduciary relationship, and their failure to meet that heightened duty is not a reason to impose personal liability upon the principals. Again, however, this is of little practical effect in light of Levin and Weiner's liability, by virtue of their signatures, for the marketing cooperation agreement.

## IV. JUDGMENT NOV ON COUNTERCLAIM COUNTS FOUR AND TWELVE

[This will address TCI's IV]

The trial court submitted to the jury two of the fourteen issues in TCI's counterclaim: count four, which alleged breach of contract, and count twelve, which alleged tortious interference with economic advantage.

Count four of TCI's counterclaim alleged that Pan Am breached its marketing cooperation agreement promise to

use best efforts in assisting TCI's marketing and sale of Pan Am's services. Count four also charged that Pan Am breached its implicit marketing cooperation agreement obligation to act in good faith. Specifically, TCI alleged that Pan Am's refusal to supply products and marketing assistance to TDU and TCI and its attempts to drive TCI out of business evidenced its breach of the agreement. TCI asked the court to award it damages exceeding five million dollars.

Count twelve of TCI's counterclaim alleged that Pan Am tortiously interfered with renewal of TCI's contract with SPATE. TCI asked for an award of more than two million dollars in compensatory damages, and a ten million dollar punitive damage award.

The trial court made the following comments:

I have gone through the fifteen [count] Pan Am claim and the fourteen count counterclaim at length after the evidence had concluded. I find much of the content of both can be eliminated for purposes of putting this case in a posture where a rational jury can grapple with the issues it [sic] that have bounced around this courtroom for the past three weeks.

Let me start with the counterclaim first. In my judgment there is really no basis for affirmative relief against Pan Am on any issue other than breach of the Marketing Cooperation Agreement and interference with contractual relations with SPATE. The counts in the counterclaim that deal with those issues are counts twelve and fourteen on which I'm not granting a judgment for the Plaintiffs.

I'm reserving on count four and count six, which deal with the breach of the agreement, and count ten, which in some convoluted way also deals with it. The rest of the affirmative relief sought in the counterclaim is out of the case because with everything except those counts I grant judgment in favor of Pan Am.

The jury concluded that Pan Am breached the marketing cooperation agreement and improperly interfered with contract renewal between SPATE and TCI, but did not interfere to the extent of inducing the litigation between them. The jury determined that five hundred thousand dollars of damages resulted.

The verdict sheet for counterclaim counts four and twelve listed only one line for damages. Thus, as TCI declares, "it is impossible to know whether the jury's award of damages applied to Count 4 or 12, or both." The relevant portions of the verdict sheet appeared as follows:

A. Breach of MCA
 Q: did Pan Am breach the MCA?
 YES, _____x_____
 NO, _____

B. Improper Interference with SPATE
 Q: did Pan Am improperly interfere with the relationship between TCI and SPATE[?]

| | YES | NO |
|---|---|---|
| 1. contract renewal | x | |
| 2. inducing litigation | | x |

C. Damages
 Q: what amount of damages has resulted?
 $ [500,000]_____

----

In response to TCI's objection at trial, the court explained its decision to format the jury instructions the way that it did. "If you put a damage question behind the breach of the [marketing cooperation agreement] and then you put another damage question behind the breach with SPATE you run the risk of compounding damages...."

Originally, the trial court believed that TCI produced enough evidence to present the damages question to the jury.

THE COURT: Thank you. That is the evidence that they produced taking it in the light most favorable to them. They [TCI] say it was worth so much before ["I don't know—two million, three million, or whatever they said before"]; it is worth zero now.

So, they have met both ends of the equation. You can certainly argue that the evidence isn't very strong, but in terms of production versus persuasion, I think they have produced enough evidence to make it a jury issue.

At the post trial motions hearing, held on October 11, 1990, the trial court decided, among other things, Pan Am's motion for judgment NOV on counterclaim counts four and twelve. The judge said:

That brings us finally to the issue of the counter-claim. I grant judgment in Count 4 and 13. I had entered—I grant the plaintiff, counter-defendant's motion for judgment N O V with respect to those counts. The evidence is sufficient to permit a jury finding that there were breaches of the marketing cooperation agreement and, in my judgment, not sufficient to sunport a finding that there was an interference with the contract renewal as the jury did find in this case. In my judgment, the evidence is insufficient as a matter of law with respect to the finding as to interference with the contract renewal. While the evidence was sufficient as a matter of law to support a finding that there was a breach, the evidence of damages was insufficient to permit the jurors to do anything but speculate. So Pan Am's judgment for motion N O V with respect to counts 4 and 13 of the amended counter-claim is granted.

Neither party informed the lower court that its references to count thirteen were inaccurate.

Recently, in *Franklin v. Gupta,* 81 Md.App. 345, 354, 567 A.2d 524, *cert. denied* 319 Md. 303, 572 A.2d 182 (1990), Chief Judge Wilner explained our procedure for reviewing judgments NOV.

We therefore must assume the truth of all credible evidence and all inferences of fact reasonably deductible from it tending to sustain appellant's contentions. If, in so doing, we find any legally relevant and competent evidence, however slight, from which the jury could rationally have found that test satisfied, we must reverse the judgments NOV.

## A. Damages

 TCI disagrees with the trial court's conclusion that the evidence was insufficient to show that damages resulted from Pan Am's breach of the marketing cooperation agreement. Pan Am, on the other hand, frames the damages issue as one of "lost profits." TCI vigorously disputes Pan Am's argument that the damages issue turns on lost profits. In TCI's words:

As is evident from the judge's opinion above, the court reached no such conclusion. Chadborne [TCI's valuation expert] did not opine as to lost profits because the Defendants never claimed lost profits resulting from Pan Am's breach of the [marketing cooperation agreement]. In Count 4 of the Counterclaim, TCI and TDU alleged that, as a result of Pan Am's failure to meet its obligations under the [marketing cooperation agreement], "TCI ha[d] virtually been driven out of business by Pan Am." Defendants' claim for damages for breach of the [marketing cooperation agreement] was based on the difference between the value of TCI before it entered into the [marketing cooperation agreement] and its zero value after it was forced out of business by Pan Am.

Weiner testified that before TCI signed the marketing cooperation agreement, TCI was worth $4,200,000.00 (in October, 1987).

Q: Without telling us what Mr. Sontag [of United States Travel Service] said, do you know what the value of the Travel Committee was?

A: Yes.

Q: What was the value?

A: I believe that the value of the Travel Committee was in excess of $4,200,000.00.

Q: And what is that based on, other than what Mr. Sontag told you?

A: Well, based on the market as it was and the stream of revenue that could be projected and the fact that the Travel Committee had earned in the year 1986–'87 ap-

proximately $1,000,000.00 in profit for the operational year.

In the in [sic] travel industry, in the wholesale travel industry there are certain factors of purchasing an agency and they go with certain multiples. Those multiples can go as high as seven and sometimes as low as one or two times commissions or one or two times gross profits. In this case I believe that the Travel Committee was worth at least four to five times the profits based on projections that we did. If Pan Am had followed through on their agreement with us to provide us with the product, we would have been worth at least that, if not more.

According to James F. Chadborne, TCI's valuation expert, TCI had cash flow income of $3,551,000 on February 29, 1988. In an internal memo, Glasberg indicated that TCI "has the potential to earn between $2 million and $3 million annually."

TCI asserts, and Pan Am does not contest, "that TCI was worth nothing by the time of trial...." The trial court found that TCI presented enough evidence of damages to survive a motion for judgment. For instance, Paul G. Wist, Pan Am's valuation expert, testified that TCI had a negative value in March 1988. Wist said that, "There was no value in the business at that point in time." He added that,

Whoever would have acquired that corporation at that point in time, at any point in time along here, would have received little in the way of an asset value and would have had to assume debts that were greatly in excess of the asset value. So to say it had no value is an under statement. In fact it had a large negative value.

If someone were given the stock in the company they would start from about a two and [a] half million dollar short fall that would have to be paid off before they got to the point of where they had enough money to pay their bills if all of the bills matured at one time and they had to settle up their accounts.

Asked what the business' assets would be worth to someone in the travel industry who came in to assume TCI's Pan Am

accounts, Wist stated that, "I don't belief [sic] it would be worth anything in this situation."

TCI's use of the word "destruction" is more suited to the realm of tort law.[11] Under Maryland contract law, TCI can recover damages so as to put it in the same position it would have been in if Pan Am had never breached the marketing cooperation agreement. *Metalcraft, Inc. v. Pratt,* 65 Md.App. 281, 294–95, 500 A.2d 329 (1985).

> [T]he party aggrieved by a breach of contract should receive damages that place him in as good a position as he would have enjoyed had the contract not been breached; in other words, that party is entitled to the benefit of his bargain.

TCI won the first part of counterclaim four when the jury found that Pan Am breached the marketing cooperation agreement. Both parties presented evidence that TCI was worth anywhere from $3,551,000 to more than $4,200,000 before they signed the marketing cooperation agreement. Furthermore, Pan Am's valuation expert stated that TCI had a negative value after the signing.

Therefore, on the damages question, legally relevant and competent evidence supported the jury's conclusion, and the trial court improperly granted judgment NOV.

## B. Interference

TCI maintains that "there was ample evidence from which the jury could have concluded that Pan Am had

---

**11.** In *Bastian v. Laffin,* 54 Md.App. 703, 714, 460 A.2d 623 (1983), we stated the rule for damages resulting from the destruction of property. "The measure of damages for tortious injury to personal property is the lesser of the difference between the value of the property immediately before the harm has been done and its value immediately thereafter or the reasonable cost of repairs."

The distinction between tort and contract fades away in light of *Knickerbocker Ice Co. v. Gardiner Dairy Co.,* 107 Md. 556, 567, 69 A. 405 (1908) ("In a suit between the parties to a contract the general rule is that whether it be an action *ex contractu,* or an action of tort, founded on the breach of the contract, the measure of damages is the same and under the control of the Court.").

interfered with the SPATE contract." In addition, TCI posits that "[t]he jury certainly could have inferred that Pan Am prevented SPATE from working with TCI while this suit was pending and that TCI was damaged." After examining the record, we are not convinced that any such inference follows.

Fannan sent TCI details of SPATE'S winter program and invited TCI to participate. In a confidential memo to Jerry Murphy dated August 22, 1988, Fannan indicated that SPATE had verbally committed to TCI a position in its winter tour products. The memo also estimated TCI's underutilization liability at $400,000. Fannan again wrote Murphy in September, indicating that TCI's participation in SPATE'S winter programs would be on hold, pending the outcome of the litigation between Pan Am and TCI. Nevertheless, the defendants continued to do business with SPATE, through TDI, the defendants' spin-off corporation. We note, too, that the jury concluded that Pan Am did not initiate the New York suit between SPATE and TCI.

The evidence does not support a jury verdict that Pan Am intentionally interfered with renewal of the SPATE contract: TCI failed to prove that Pan Am was the source of the failure of its relationship with SPATE. The trial court did not err in granting judgment NOV on this count.

## V. TARIFF ISSUES

[This addresses TCI's V and Pan Am's IV]

TCI alleges that, without its knowledge, Pan Am violated federal law by not including in tariffs (filed with the Department of Transportation (DOT)) fares and restrictions on tickets sold pursuant to the Net Ticketing Agreements with TCI. Count 1 of TCI's counterclaim sought a declaratory judgment that Pan Am's sale of those tickets violated federal law, and, therefore, that Pan Am should be precluded from collecting any amounts due on those tickets.

The trial court denied TCI's motion for partial summary judgment on this count. All, however, was not lost. The

trial court allowed TCI to use the allegedly illegal behavior as an affirmative defense.

> So that's my ruling on the [partial] summary judgment motion. I think clearly the plaintiffs [TCI] have a right to assert it in an affirmative defense, and I suppose they have a prima facie case because of it. But I can't say that the defendants [Pan Am] have to lose as a matter of law on it on the basis of the industry standard and the routine practice, evidence that would be available to the plaintiffs.

In an abrupt about face, according to TCI, on July 17, 1990, less than a month before trial, the judge granted Pan Am's motion for partial summary judgment on this issue. In addition, the judge withdrew TCI's right to raise tariff violation as an affirmative defense during trial.

> THE COURT: If Pan Am's flight lands ten minutes late maybe that is an illegal flight, but that doesn't mean they can't charge people. I have gone over this one hundred and fifty times. My ruling remains the same. No reference can be made to the illegal tariff matter.

On appeal, TCI declares that the lower court's rulings "were wrong." We are of a different mind.

Section 403(a) of the Federal Aviation Act addresses tariffs of air carriers.

> Every air carrier and every foreign air carrier shall file with the Board, and print, and keep open to public inspection, tariffs showing all rates, fares, and charges for air transportation between points served by it, and between points served by it and points served by any other air carrier when through service and through rates shall have been established, and showing to the extent required by regulations of the Board, all classifications, rules, regulations, practices, and services in connection with such air transportation. Tariffs shall be filed, posted, and published in such form and manner, and shall contain such information, as the Board shall by regulation prescribe; and the Board is empowered to reject any tariff

so filed which is not consistent with this section and such regulations. Any tariff so rejected shall be void. The rates, fares, and charges shown in any tariff shall be stated in terms of lawful money of the United States, but such tariffs may also state rates, fares, and charges in terms of currencies other than lawful money of the United States, and may, in the case of foreign air transportation, contain such information as may be required under the laws of any country in or to which an air carrier or foreign air carrier is authorized to operate.

Both parties discuss the ramifications of the federal preemption doctrine in this dispute. Our examination of the relevant statutes and case law leads us to conclude that neither we nor the trial court have the authority (jurisdiction) to determine whether Pan Am's actions violated 49 U.S.C.App. § 1373(a) (1988). The United States Congress vested that authority, until recently, with the Civil Aeronautics Board (CAB).[12]

Questions concerning rates, routes, or services of an air carrier are, generally, reserved for the federal system.

§ 1305. Federal preemption

(a) Preemption.

(1) Except as provided in paragraph (2) of this subsection, no State or political subdivision thereof and no interstate agency or other political agency of two or more States shall enact or *enforce* any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier having authority under subchapter IV [Air Carrier Economic Regulation] of this chapter to provide air transportation. (Emphasis added).

---

12. According to the legislative history following 49 U.S.C.App. § 1305 (1988),

[t]he Civil Aeronautics Board terminated on Jan. 1, 1985, and all functions, powers, and duties of the Board were terminated or transferred by section 1551 of this Appendix, effective in part on Dec. 31, 1981, in part on Jan. 1, 1983, and in part on Jan. 1, 1985. *See* 49 U.S.C.App. § 1551 (1988).

(2) Except with respect to air transportation (other than charter air transportation) provided pursuant to a certificate issued by the [Civil Aeronautics] Board under section 1371 of this Appendix, the provisions of paragraph (1) of this subsection shall not apply to any transportation by air of persons, property, or mail conducted wholly within the State of Alaska.

Abundant case law exists indicating that tariff questions belong to the CAB's, and its successor's, domain. *Clemente v. Philippine Airlines*, 614 F.Supp. 1196, 1199 n. 3 (S.D.N.Y.1985) ("Plaintiffs have not challenged the validity of the tariffs. In any event, the Civil Aeronautics Board has primary jurisdiction to determine the validity of a filed tariff. *Danna v. Air France*, 463 F.2d 407, 409 (2d Cir. 1972). Because plaintiffs have not sought administrative review of the applicable tariff, they are bound by its provisions for the purposes of this action.").

Furthermore, courts treat filed tariffs as valid, unless and until the CAB (or its successor) rules otherwise. In *Alco–Gravure Div. of Publications Corp. v. American Airlines*, 173 F.Supp. 752, 755 (D.Md.1959), the court indicated that:

[t]he principle established by these cases with regard to the Civil Aeronautics Board and the tariffs therewith filed by the air line carriers, is in substance this: The carrier is obliged by the statute and regulations to file these schedules in the first place. The Board may at once reject them as improper or unreasonable; but if not so rejected they continue to be valid and enforceable until the question of their alleged invalidity for unreasonableness or otherwise is challenged by the Board or by interested parties before the Board, and held by the Board to be invalid. In a suit against a carrier the tariff schedules must be accepted and applied by the courts in litigation unless and until the Board has otherwise ruled. This is in accordance with the modern judicial point of view with respect to federal regulatory agencies.

In *Schaefer v. National Airlines Inc.*, 499 F.Supp. 920, 924 (D.C.Md.1980) (citations omitted), the court opined that it

> entertains grave doubts as to both its power and that of the CAB to declare that a tariff was retrospectively invalid. The decision as to whether or not a tariff is unreasonable is, of course, one to be made by the CAB, but that can only be done prospectively and not retrospectively.... Thus, a tariff will be effective up until the time it is cancelled by the CAB.

*See also Crosby & Co., Inc. v. Compagnie Nationale Air France*, 76 Misc.2d 990, 352 N.Y.S.2d 75, 82 (N.Y.Sup.Ct.), *aff'd*, 42 A.D.2d 1050, 348 N.Y.S.2d 957 (1973), *cert. denied*, 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed.2d 763 (1974) ("Questions of the reasonableness of rates, regulations, and practices in air transportation regulated by the Federal government are left to the administrative agency governing the industry, in this case the Civil Aeronautics Board."); *Aetna Ins. Co. v. Bor–Air Freight Co., Inc.*, 72 Misc.2d 327, 338 N.Y.S.2d 786, 788 (N.Y.Civ.Ct.1972) ("provision of tariffs filed by licensed air carriers with the C.A.B. are valid unless and until they are rejected by that body....").

Accordingly, any ruling premised upon the notion that Pan Am filed improper tariffs, or any discussion at trial as to the allegedly illegal nature of the tariffs, would have been "premature" and improper. Additionally, the statute's plain language precludes state enforcement. Thus, we hold that the lower court correctly ruled on this issue.

## VI. TCI's COUNTERCLAIM

[This addresses TCI's issue VI]

TCI argues that the trial judge improperly granted Pan Am's motions for judgment on TCI's Counterclaim counts two, three, six, seven and eleven.[13] It contends that these

___

13. The trial judge commented as follows:

issues should have been put to the jury, and TCI therefore asks this court to remand the case for trial on these counts.

A judge considering a party's motion for judgment must "consider all evidence and inferences in the light most favorable to the party against whom the motion is made." Md.R. 2–519. As Neimeyer and Richards, *Maryland Rules Commentary* point out at 301:

> The motion will be denied if there is relevant and competent evidence, however, slight, from which a rational mind could infer a fact in issue. To enter judgment in the face of such evidence would invade the province of the jury to find facts. All evidence must be considered in the light most favorable to the party against whom the motion is made. All inferences to be drawn from those facts must be resolved against the party making the motion.... Judgment may be entered only if there are no facts from which a jury could rationally render a verdict in favor of the plaintiff.

### A. The Fraud and Negligent Misrepresentation Claims

 TCI alleged that Pan Am fraudulently misrepresented that it would provide TCI with travel products and use its best efforts to support and assist TCI. It claims that the evidence showed that Pan Am had decided to do business with retail agencies, instead of with wholesalers and consolidators such as TCI, at the very time it was promising TCI that it would supply products to TCI that would allow TCI to prosper. Thus, a jury could find that Pan Am

---

> In my judgment there is really not basis for affirmative relief against Pan Am on any issue other than breach of the Marketing Cooperation Agreement and interference with contractual relations with SPATE. The counts in the counterclaim that deal with those issues are counts twelve and fourteen on which I'm not granting a judgment for the Plaintiffs.
>
> I'm reserving on count four and count six, which deal with the breach of the agreement, and count ten, which in some convoluted way also deals with it. The rest of the affirmative relief sought in the counterclaim is out of the case because with everything except those counts I grant judgment in favor of Pan Am.

The judge affirmed this ruling at the post-trial hearing on October 11.

knowingly made false representations, which TCI reasonably relied upon, with the intent of inducing TCI to sign the marketing cooperation agreement. Alternatively, the jury could find that Pan Am's actions constituted negligent misrepresentation.

The evidence TCI adduces to support its argument is an excerpt from a speech made by Pan Am President Thomas Plaskett indicating Pan Am's plan to market tickets through retail agencies instead of through wholesalers. This would remedy a problem that came to his attention soon after his January 1988 appointment: Pan Am had become overly reliant on the wholesale market, selling too much of its product at wholesale prices. TCI charges that Pan Am's new marketing plan directly contravened the marketing cooperation agreement, which TCI would not have signed were it not for Pan Am's alleged misrepresentations.

Maryland law dictates that proof of fraud must be "clear and convincing and such as will appeal strongly to the conscience of the court...." *Finch v. Hughes Aircraft Co.*, 57 Md.App. 190, 230, 469 A.2d 867 (1984) (quoting *Peurifoy v. Congressional Motors, Inc.*, 254 Md. 501, 517, 255 A.2d 332 (1969). We outlined the elements of a cause of action for fraud in *Finch:*

(1) that defendant made a misrepresentation of a material fact which was false; (2) that its falsity was known to him; (3) that defendant made the misrepresentation for the purpose of defrauding plaintiff; (4) that plaintiff not only relied upon the misrepresentation but had the right to do so and would not have done the thing from which the damage resulted if it had not been made; and (5) that plaintiff suffered damage from defendant's misrepresentation. Concealment by defendant of a material fact for the purpose of defrauding plaintiff is also actionable fraud under Maryland law provided that plaintiff suffers damage as a result. However, mere non-disclosure of facts known to defendant without intent to deceive is not fraud and is not actionable under Maryland law unless

there exists a separate duty of disclosure to plaintiff by defendant.

*Id.* at 231–32, 469 A.2d 867 (citations omitted). The Court also explained that promissory statements and predictions are not actionable as fraud unless a promise is made with the present intent not to perform it. *Id.* at 232, 469 A.2d 867; *see also Levin v. Singer*, 227 Md. 47, 63–64, 175 A.2d 423 (1961).

We see nothing in the evidence to support TCI's claim that Pan Am did not intend to adhere to promises it allegedly made to TCI. Likewise, notwithstanding Glasberg's statements that everyone was going to get rich, TCI did not show that Pan Am negligently represented future benefits, thereby fraudulently inducing TCI to enter the marketing cooperation agreement. We therefore find that the trial judge's entry of judgment was proper: Pan Am's statements were not actionable misrepresentations.

### B. Breach of Fiduciary Duty

 TCI argued that by virtue of the marketing cooperation agreement, Pan Am owed it a fiduciary duty premised upon Pan Am's "effective control over TCI's operations and finances" and its "enormous power over TCI." [14] TCI argues that evidence of Pan Am's fiduciary duty, and subsequent breach of that duty, was sufficient to submit the issue to the jury for its determination. TCI therefore asks us to remand the case for a new trial.

TCI's claim that Pan Am owed it a fiduciary duty is premised upon the argument that the marketing cooperation agreement gave Pan Am substantial influence, control, and dominance over TCI's management and operation. TCI points to the marketing cooperation agreement's language requiring Pan Am to "utilize its best efforts to assist TCI in

---

**14.** TCI alleged that Pan Am deliberately harmed TCI by, *inter alia,* forbidding TCI from taking reservations more than 30 days in advance of departure, and ordering TCI to desist using electronic Q-ing, the method by which high-volume retail agencies obtain direct access to wholesalers' computers.

the marketing and sale of Pan Am services." Additionally, TCI points to Glasberg's assertion that the agreement imposed upon Pan Am a "fiduciary obligation" and that Pan Am would treat TCI as Pan Am's "most favored nation."

We point out that Glasberg's statements could be regarded as puffery of no legal consequence. Likewise, the marketing cooperation agreement's terms do not give rise to a fiduciary obligation on Pan Am's part. We conclude, as per our section III discussion *supra,* that the trial court's determination that this issue should be resolved in Pan Am's favor was correct, and we therefore affirm: Pan Am did not owe TCI a fiduciary duty.

### C. Breach of Contract

Count eleven of TCI's counterclaim alleged that Pan Am breached its agreement to sell tickets at stated prices when it unilaterally increased round trip fares by sixty dollars per seat and applied this increase to seats that TCI already had sold. TCI's counterclaim argues that "[b]oth contract and course of dealing between the parties prevented Pan Am from making this unilateral change" and asks us to grant it a new trial.

TCI points to the following evidence to support its claim that the parties had a contractual agreement that Pan Am breached: Pan Am agreed to sell tickets at stated prices and confirmed those prices in a letter; TCI could not have foreseen the increase because in the many years of its relationship with Pan Am, Pan Am never increased prices for reservations TCI had already taken.

Although the trial judge did not elaborate upon his reasons for denying TCI's counterclaim on this point, our review of the record indicates that the evidence on this point was insufficient to reach the jury. A travel agent can guarantee fares only by writing a ticket as soon as the customer makes the order. TCI's unfortunate position was the result of its own actions in delaying ticket writing. Pan Am's price list was just that: a price list, and not a contract. And even though Pan Am never previously exercised its

prerogative to raise its fares, this did not establish a course of dealing that would prevent it from raising its rates.[15] As we have seen, *supra*, TCI knew that Pan Am was entitled to raise its rates, and TCI accordingly warned its own customers that rates were subject to change.

### VII. PAN AM'S ADDITIONAL REQUESTS FOR JUDGMENT

[This addresses Pan Am's Issue V]

As to most of the following counts, Pan Am requested the trial court to enter judgment notwithstanding the verdict. We note at the outset that:

[i]n ruling on the motion the court must assume the truth of all credible evidence on the issue and must take that evidence and all inferences fairly deducible therefrom in the light most favorable to the party against whom the motion is made. If that evidence and those inferences are sufficient to lead to conclusions from which reasonable minds could differ, the motion must be denied; the weight and value of the evidence is for the jury.

*Battista v. Savings Bank of Baltimore*, 67 Md.App. 257, 262–63, 507 A.2d 203 (1986).

### A. Count Two

Pan Am argues that the trial court erred in not entering judgment on count two of its complaint against TDU, Weiner, and Levin. In count two, Pan Am argued that the marketing cooperation agreement obligated TDU, Levin, and Weiner to pay TCI's debts, including the $404,-

---

**15.** The Restatement (Second) of Contracts § 223, which TCI urges as authority for its position, states that

(1) A course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

(2) Unless otherwise agreed, a course of dealing between the parties gives meaning to or supplements or qualifies their agreement.

We point out that this section is predicated upon the existence of an agreement, and that TCI's reliance upon it therefore is misplaced.

726.77 promissory note. The jury concluded that TCI was liable on the promissory note but that TDU, Weiner, and Levin were not liable. At the October 11, 1990 post-trial hearing, the trial judge refused Pan Am's request to enter judgment against TDU, Weiner, and Levin on the promissory note, indicating that, "I'm not going to impose liability under Count 1 on anybody other than TCI. The jury has spoken with respect to that."

Pan Am marshals support for its argument in the language of paragraph 17(I), which provides that "TCI, TDU and the principals represent, warrant and agree that, ... [a]ll expenses, taxes, fees and all other liabilities of whatsoever kind for which TCI shall become liable in the operation of its business or otherwise will be timely paid." *See supra.* Pan Am argues that this language constitutes an express guarantee of TCI's liabilities, and the trial court therefore should have entered judgment NOV.

The jury determined that Levin, Weiner, and TDU were not liable on the promissory note, thereby implicitly rejecting the theory that the marketing cooperation agreement imposed upon them individual liability. The jury is uniquely qualified to make determinations of fact, and this decision constitutes a finding of fact. *See* 38 C.J.S. Guaranty § 103 (1943) (where facts are disputed, whether there is contract of guaranty is a question for the jury). The trial court erred neither in submitting this question to the jury, nor in refusing Pan Am's request to upset the jury's decision with a judgment NOV.

### B. Count Seven

Pan Am argues that the trial court should have entered judgment against all of the defendants pursuant to count seven of its complaint, in which it alleged that TCI, TDU, Levin, and Weiner fraudulently converted to their

own use $2,600,000 belonging to Pan Am.[16] In its cross-appeal, however, Pan Am back-pedals a bit and points out that the law does not require a fraudulent taking, only that the taking be intentional. It also contends, citing Missouri case law, that conversion may include failure to remit monies in one's possession pursuant to a principal-agent relationship. Pan Am does not dispute the legitimacy of TCI's initial receipt of the sale proceeds but argues that TCI's subsequent failure to remit the money it owed Pan Am constituted conversion. Pan Am argues that the trial court should either have entered judgment in its favor or submitted to the jury the issue of conversion.

 A claim for conversion requires proof of the following elements: (1) the plaintiff's right to possess the disputed property, and (2) an intentional taking of that property by a person without authority or permission. *See Battista v. Savings Bank of Baltimore*, 67 Md.App. 257, 261, 507 A.2d 203 (1986).

TCI was not obligated to segregate money it collected from ticket sales. Pan Am did not require it, and neither did the ARC agreement. The trial court recognized this, explaining to the jury that:

> [T]he ARC Report is this central agency that collects statistics about what monies are due airlines by the travel agent. The law is that the agency that uses that service is supposed to have the money available to pay the airline at the time of the ARC Report.
>
> With respect to this, the issue is did the Defendants have the money at the time the money was due and owing. It really doesn't matter whether they had the money at the time the ticket was written or whether they had the money at the time the ticket was written and was due and owing. The law is if you write a ticket and use

---

**16.** These monies included the amount due under the August 1988 ARC reports, and the under-remittances on tickets sold in June and July, 1988.

the ARC system, when that ARC Report comes out you have to have the money there to pay the ARC Report.

So, you have to have it then. It doesn't matter that you didn't have it before, it doesn't matter that you didn't have it when you write the ticket and it is due and owing. You have to have the money, according to the ARC system, at the time the ARC Report comes due.

Among parties to a contract, failure to pay the contract price is not conversion—it is a breach of contract. Pan Am's claim to these monies arises from a contract theory, and not upon conversion theory. The trial court's comments to the jury reflect this, and we perceive no error in the court's denial of Pan Am's motion for judgment.

## C. Count Eleven

■ Pan Am argues that the trial court should have entered judgment against TDU, Weiner, and Levin on count eleven of its complaint, in which it alleged that the sale of substantially all of TDU's assets to TDI breached the marketing cooperation agreement, paragraph 17(P), which prohibits TDU from selling corporate assets without Pan Am's prior written approval.[17] Pan Am contends that uncontroverted evidence at trial demonstrated that Weiner and Levin directed the transfer to TDI of substantially all TDU's assets, and that it did this without Pan Am's prior approval.

We begin by pointing out that, notwithstanding its claim in count eleven, Pan Am produced no evidence at trial to demonstrate that there was a "sale" in which TDU transferred all of its assets to TDI. Although not dispositive, the trial judge was entitled to give this weight. And even though TDU withdrew from the retail business after TDI's

---

**17.** The relevant paragraph reads as follows:
TCI, TDU, the principals represent, warrant and agree that during the entire period ... TDU or TCI shall not, without prior written approval of Pan Am, sell, or enter into any agreement providing for the sale of, any corporate assets other than in the ordinary course of business.

creation, it retained its ARC plates (necessary to write tickets) and its stock in TCI, which was still engaged in consolidator enterprises. Given this, the trial court's decision to deny Pan Am's motion for judgment was not error.

## VIII. PAN AM'S FOURTH AMENDED COMPLAINT

### [This addresses Pan Am's Issue VI]

 Pan Am's Fourth Amended Complaint contained a count alleging that TCI, TDU, Weiner, Levin, and TDI conspired to defraud Pan Am. Pan Am alleged that TDI transferred substantial sums of money to TCI and TDU, and then to Levin, Weiner, and Francis McVeigh, TDI's President. It also alleged that TDU transferred assets to TDI and that TCI transferred to TDI all of its profitable business, as well as its contract rights to a percentage of TDI's gross annual earnings. Additionally, Pan Am alleged that after the defendants reduced TCI to an "insolvent shell," they used TCI to sell Pan Am tickets "knowing full well that TCI did not have and would not have the money to pay Pan Am for such sales," and that they concealed those sales from Pan Am. The trial court dismissed this count on the ground that Pan Am failed to state a claim upon which relief could be granted. Pan Am asks us to reverse the trial judge's decision on this matter, and to remand it for a new trial.

This court must assume the truth of all well-pleaded facts in the complaint because the count was disposed of on a motion to dismiss. *Wimmer v. Richards,* 75 Md.App. 102, 105, 540 A.2d 827, *cert. denied,* 313 Md. 506, 545 A.2d 1344 (1988). Nevertheless, we conclude that the trial court reasonably could find that Pan Am did not allege facts sufficient to indicate that TDI conspired to retain funds it owed to TCI, or that TDI was involved in payments to Levin and Weiner from TCI or TDU. TDI's payments reasonably could be interpreted as legitimate payments of management fees.

We add that in light of the jury's determination that Levin and Weiner did not conspire to improperly obtain management fees from TCI and TDU, Pan Am's attempt to revive the same claim with respect to TDI is surprising.

## IX. PUNITIVE DAMAGES

[This addresses Pan Am's Issue VII]

Pan Am argues that the trial judge's failure to submit to the jury the issue of punitive damages was in error.[18] Pan Am alleges that TCI committed fraud and acted with malice, thereby justifying a punitive damages award. In supporting its fraud argument, Pan Am points to its fraud allegations discussed *supra,* and bolsters its malice argument with the allegation that Pan Am was TCI's only target in its "systematic pattern of fraud and deception."

We perceive no merit in Pan Am's arguments. Punitive damages may be justified if the defendant's conduct evidences malice, fraud, or evil intent. *See General Motors Corp. v. Piskor,* 277 Md. 165, 175–76, 352 A.2d 810 (1976), (*Piskor I*), *appeal after remand,* 281 Md. 627, 381 A.2d 16 (1977) (*Piskor II*); *see also H & R Block v. Testerman,* 275 Md. 36, 42, 338 A.2d 48 (1975) (malice is absolute prerequisite to punitive damages); *Owens–Illinois, Inc. v. Zenobia,* 325 Md. 420, 460, 601 A.2d 633 (1992) (actual malice required in non-intentional tort action). Although a court may not award punitive damages in a pure action for breach of contract, punitive damages are available in tort actions arising out of a contractual relationship, provided that the plaintiff has established actual malice.

---

**18.** The judge said, "Nobody is entitled to punitive damages. I read the cases and reread the cases and nobody is entitled to punitive damages as I see it. Therefore, the jury isn't going to hear anything about punitive damages."

*See H & R Block,* 275 Md. at 44, 338 A.2d 48;[19] *see also Piskor II,* 281 Md. at 638–39, 381 A.2d 16 (explicating public policy reasons for requiring varying standards of malice in tort, contract, and mixed actions). Actual malice is "the performance of an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff." *H & R Block,* 275 Md. at 43, 338 A.2d 48 (citing *Siegman v. Equitable Trust Co.,* 267 Md. 309, 314, 297 A.2d 758 (1972) and *Drug Fair v. Smith,* 263 Md. 341, 352, 283 A.2d 392 (1971)). *See also Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs., Inc.,* 88 Md.App. 672, 596 A.2d 687 (1991).

Elements of Pan Am's allegations might be characterized as tort actions arising from the parties' contractual relationships. Nevertheless, the jury determined that no fraud had been committed, thereby vitiating Pan Am's claim of tortious conduct arising from the underlying contract,[20] and the record does not support Pan Am's allegations that actual malice motivated TCI's behavior. Given this, the trial court did not err in keeping this issue from the jury. We therefore deny Pan Am's request.

## X. PRE–JUDGMENT INTEREST

[This addresses Pan Am's issue VIII]

### A. Pre-judgment Interest on the Entire Judgment

■ The trial judge awarded Pan Am ten percent pre-judgment interest on the promissory note. Pan Am argues

---

19. The Court of Appeals has indicated that "[i]n order ... for an alleged wrong to constitute a 'tort arising out of a contractual relationship,' ... we require that there be a direct nexus between the tortious act and performance or breach of the terms and conditions of the parties' underlying contract." *Piskor II,* 281 Md. at 640, 381 A.2d 16.

20. We point out, too, that the jury determined that the transfer of management fees to Weiner and Levin was not a fraudulent conveyance, and that transfer of TDU's assets to TDI was not a fraudulent conveyance.

that as a matter of law, it is entitled to recover pre-judgment interest on the unremitted sums TCI owes it in connection with the August 1988 ARC Reports and the under-remittances on tickets TCI sold in June and July, 1988.

The Court of Appeals has indicated that, ordinarily, "interest should be left to the discretion of the jury, or the Court when sitting as a jury." *Affiliated Distillers Brands Corp. v. R.W.L. Wine and Liquor Co.*, 213 Md. 509, 516, 132 A.2d 582 (1957). The court noted several well established exceptions, however, including cases in which the money has been used, and in which there is a unilateral contractual obligation to pay money at a certain time. *Id.*

The record supports the conclusion that TCI used monies it collected from ticket sales, and that these amounts became payable upon the dates the monies were due under the ARC reports. The fact that TCI and Pan Am disputed adjustments to the amount TCI owed Pan Am indicates that the sum owed was not certain until the jury made its determination, but we see no reason why this should interfere with an award for pre-judgment interest as to that amount actually due and owing. To the contrary, we conclude that Pan Am is entitled as a matter of law to pre-judgment interest accrued from the date of the reports, and we therefore vacate that portion of the trial court's award and remand it to that court for a new computation of interest based upon both awards.

### B. Compound Pre–Judgment Interest

Pan Am argues that because it received judgment in its favor on count six, pertaining to breach of fiduciary duty, the interest rate applied to monies the defendants failed to remit should be compounded. Pan Am's argument is predicated upon the existence of a fiduciary relationship.

In light of our finding, *supra,* that TCI did not owe Pan Am a fiduciary duty, we conclude that an award of compound interest would be inappropriate.

### C. The Interest Rate

██ Pan Am argues that the trial court's imposition of interest at a rate of ten percent was proper. Although Pan Am cites a Fourth Circuit case in which the court predicted that Maryland's courts would apply a six percent interest rate to the period before judgment, Pan Am argues that this court should follow the dissent, and set the pre-judgment interest rate at ten percent. *See Federal Savings & Loan Ins. Corp. v. Quality Inns,* 876 F.2d 353 (4th Cir. 1989).

This we decline to do. The Maryland Constitution sets the legal rate of interest at six percent per annum, unless the General Assembly provides otherwise. *See* Md.Const. art. III, § 57. The General Assembly provided otherwise in Md.Cts. & Jud.Proc.Code Ann. § 11–107 (1989), which states that "the legal rate of interest on a judgment shall be at the rate of 10 percent per annum on the amount of judgment." This applies, however, to *judgments,* and not to pre-judgment obligations. The general rule remains undisturbed: the legal rate of interest is six percent per annum. Accordingly, we vacate that portion of the trial court's order awarding Pan Am ten percent simple pre-judgment interest, and remand to that court for computation of interest at the rate of six percent.

## XI. ATTORNEY'S FEES

### [This addresses Pan Am's Issue IX]

██ Judge Murphy denied Pan Am's request for attorney's fees without expressing his reasons for this decision. Pan Am now asks us to reverse that ruling, arguing that Maryland laws permit a lawsuit's prevailing party to recover reasonable attorney's fees in situations, such as this one, in which a contract's parties have an agreement providing for them.

Pan Am points to the promissory note that TCI signed, which contains a provision allowing Pan Am to recover

attorney's fees in the event of TCI's default.[21]

Once judgment was entered on the promissory note, the trial court should have awarded Pan Am reasonable attorney's fees.[22] *See Qualified Builders, Inc. v. Equitable Trust Co.*, 273 Md. 579, 584, 331 A.2d 293 (1975) (no question that stipulation in promissory note to pay attorney's fees is valid and can be enforced). Consequently, we remand to the trial court the issue of reasonable attorney's fees on the promissory note.

## SUMMARY

We conclude that TCI is liable in the amount of $404,726.77 on the promissory note. TCI, TDU, Levin, and Weiner are liable in the amount of $1,570,083.26 for the August, 1988 ARC reports. We also conclude that the trial court should not have granted judgment NOV as to the appellants' counterclaim that Pan Am breached the marketing cooperation agreement, and therefore direct that the jury's $500,000 judgment be reinstated and deducted from the $1,570,083.26 award against TCI, TDU, Levin, and Weiner. The trial court should have awarded Pan Am six percent simple pre-judgment interest on the entire judgment against the appellants. Finally, the trial court erred in failing to award Pan Am attorney's fees, as per the terms of the promissory note.

JUDGMENT AFFIRMED WITH RESPECT TO THE AWARD IN FAVOR OF PAN AM AGAINST TCI $404,726.77.

---

**21.** "In the event that an action is instituted to recover any payments pursuant to this Promissory Note, Pan Am shall recover ... all expenditures incurred in collecting this Promissory Note and in defending any action by the Maker, as the case may be, including costs, disbursements and reasonable attorney's fees." Plaintiff's Exhibit 12.

**22.** Pan Am also argues that these fees would then have been TDU's, Weiner's, and Levin's responsibility by virtue of paragraph 17 of the marketing cooperation agreement. We need not discuss this in light of the jury's implied rejection of Pan Am's guarantee theory. See discussion on "Verdict Issues" in this opinion, Section I.

JUDGMENT AFFIRMED WITH RESPECT TO THE AWARD IN FAVOR OF PAN AM AGAINST TCI, TDU, LEVIN, AND WEINER IN THE AMOUNT OF $1,570,-083.26.

JUDGMENT NOV REVERSED WITH RESPECT TO PAN AM'S BREACH OF THE MARKETING COOPERATION AGREEMENT, AND CASE REMANDED FOR ENTRY OF JUDGMENT IN TCI'S FAVOR IN THE AMOUNT OF $500,000, TO BE DEDUCTED FROM THE $1,570,-083.26 AWARD IN PAN AM'S FAVOR.

JUDGMENT VACATED WITH RESPECT TO PAN AM'S PRE-JUDGMENT INTEREST, AND CASE REMANDED TO THE TRIAL COURT TO RECALCULATE SIX PERCENT SIMPLE INTEREST ON THE BASIS OF THE ENTIRE JUDGMENT.

JUDGMENT VACATED ON THE ISSUE OF PAN AM'S ENTITLEMENT TO ATTORNEY'S FEES, AND REMANDED TO THE TRIAL COURT FOR THE CALCULATION OF REASONABLE ATTORNEY'S FEES, TO BE PAID BY TCI.

COSTS TO BE PAID ½ BY APPELLANTS, ½ BY APPELLEE.

JUDGMENT VACATED ON COUNT FOURTEEN AS TO ALL DEFENDANTS.